Filed 11/30/15

# IN THE SUPREME COURT OF CALIFORNIA

B.H., a Minor, etc., )
)
      Plaintiff and Appellant, )
)       S213066
      v. )
)     Ct.App. 4/2 E054516
COUNTY OF SAN BERNARDINO )
et al., )
)    San Bernardino County
      Defendants and Respondents. )  Super. Ct. No. CIVDS913403
_____ )

The intent and purpose of the Child Abuse and Neglect Reporting Act (CANRA; Pen. Code, § 11164 et seq.) is to protect children from abuse and neglect. (Pen. Code, § 11164, subd. (b).)[1] One of the stated fundamental goals of CANRA is to increase communication and the sharing of information relating to child abuse and neglect among the agencies responsible for the welfare of children. (§ 11166.3, subd. (a).) To accomplish this, CANRA designates certain agencies to accept reports of alleged child abuse or neglect and to cross-report the information contained therein to other agencies. (§ 11166.)

Here, a private citizen called a 911 operator to report an incident of suspected child abuse during the child's visit with his father. The operator relayed the report to the San Bernardino County Sheriff's Department (Sheriff's

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

Department).  A deputy sheriff was dispatched to investigate the report.  The officer determined that there was an ongoing custody dispute between the parents, the child was not a victim of child abuse, and there was no need for further investigation.  Neither the Sheriff's Department nor the officer cross-reported the initial 911 report to the county child welfare agency.  About three weeks later, the child suffered extensive head injuries during a visit with his father.

The child, through a guardian ad litem, sued the county and the deputy sheriff, among others, for failing to cross-report the initial child abuse allegations to the child welfare agency, in violation of CANRA.  The trial court granted defendants' motion for summary judgment finding there was no duty to cross-report and defendants were immune from liability.  The Court of Appeal affirmed the trial court's ruling.

This case presents two issues for our review:  (1) whether CANRA imposed a mandatory duty on the Sheriff's Department to cross-report the child abuse allegations to the relevant child welfare agency when it received the 911 report and (2) whether CANRA imposed a mandatory duty on the investigating deputy sheriff to report the child abuse allegations and her investigative findings to the relevant child welfare agency despite her conclusion of no child abuse.

We conclude that the Sheriff's Department had a mandatory and ministerial duty to cross-report the child abuse allegations made to the 911 operator to the child welfare agency and that the failure to cross-report can support a finding of breach of a mandatory duty, elements required to establish public entity liability. (§ 11166, subd. (k); Gov. Code, § 815.6.)  We further conclude that the officer had no duty to report the child abuse allegations and her investigative findings to the child welfare agency.  (§ 11166, subd. (a).)

Accordingly, we affirm the judgment of the Court of Appeal in part and reverse in part.

## FACTS AND PROCEDURAL HISTORY

Plaintiff, B.H., was born in August 2006. At all times after plaintiff's birth, mother Lauri H. and father Louis Sharples lived apart. Starting in February or March 2008, Lauri H. and Sharples informally agreed that Sharples could begin to take physical custody of plaintiff for periods of a few days, which eventually occurred every weekend.

In July 2008, Lauri H. and Sharples began to have custody disputes over plaintiff. Over the Fourth of July holiday, Sharples was scheduled to take plaintiff for five days. After plaintiff was dropped off, Sharples called the Sheriff's Department on July 2 and reported he noticed plaintiff frequently had bruises when he arrived for his visits. Sharples also reported that on this particular visit, plaintiff "ha[d] bruises around his neck" and "it look[ed] like somebody choked him." This prompted Lauri H. to call the county department of children and family services (DCFS) the following day to report that Sharples had made a false report of child abuse. Lauri H. reported that she noticed that plaintiff often returned from visits with various injuries.

Both Sharples's report to the Sheriff's Department and Lauri H.'s report to DCFS were subsequently investigated. The officer responding to Sharples's report interviewed both parties and found the allegations inconclusive. Likewise, DCFS social worker Leann Ashlock met with both parties and urged them to reconcile their differences. Ashlock coordinated a supervised visit so Lauri H. could see plaintiff on July 28. The parties decided to continue sharing custody of plaintiff until they could settle their matters before a family law court.

On September 17, 2008, a family law court granted Sharples one midweek visit and custody of plaintiff every weekend. During the following weekend, on September 22, Lauri H. picked up plaintiff after a visit with Sharples and noticed a scratch and bruises on his face. When Lauri H. returned home with plaintiff, she

discussed the injuries with Christy Kinney, the woman who raised Lauri H. and with whom she and plaintiff were living. Kinney advised Lauri H. to photograph plaintiff's injuries. Lauri H. took photographs of plaintiff's face and body before she left for school. At 10:14 that evening, while Lauri H. was out for an evening class and party, and without Lauri H.'s knowledge, Kinney called 911 to report her suspicions of child abuse to the Sheriff's Department. During the call, Kinney reported that Sharples said plaintiff "fell out of the car or the truck" but that Sharples's "girlfriend said he fell down the stairs" at a local fast food restaurant. The 911 operator recorded the information as a child abuse report, dispatched it to the Sheriff's Department computer-aided dispatch system, and requested that an officer look into the matter.

Deputy Sheriff Kimberly Swanson responded to the residence shortly before midnight and spoke with Kinney. At this time, plaintiff was asleep and in Kinney's care. Kinney woke plaintiff for Deputy Swanson to observe him. For about 20 minutes, Swanson spoke with Kinney and attempted to examine plaintiff, who was crying and unresponsive because Kinney had just awakened him. Afterwards, Deputy Swanson returned to her patrol vehicle and conducted a computer record check on both Lauri H. and Sharples. She returned to the house, gave Kinney her contact information, and requested that Lauri H. contact her when she returned home. Deputy Swanson never heard from either Lauri H. or Kinney.

Three days later, Deputy Swanson wrote a report about the incident. Deputy Swanson cleared the case, concluding that there was an ongoing custody dispute between plaintiff's parents, and that the case was "for information only at this time and forward to station files." Swanson noted that Kinney saw that plaintiff "had a cut and bruising above his right eye" when he returned from his weekend visit with his father. Swanson also noted that plaintiff "had small bruises, which appeared to be old, on his upper right arm and on his back" and that

4

Kinney had contacted Sharples, who told her plaintiff had fallen and bumped his head. Sergeant Jeff Bohner, Deputy Swanson's supervisor, reviewed and approved the report.

Lauri H. did not allow plaintiff to visit Sharples again until October 10 or 11, 2008. During the following weekend's visit, Sharples called his girlfriend and said that plaintiff had fallen, hit his head, and would not wake up. Sharples's girlfriend rushed home, noticed that plaintiff was "stiff," and asked if Sharples had called 911. When Sharples responded that he had not, his girlfriend instructed him to call 911, while she notified Lauri H. Emergency personnel responded and transported plaintiff to Loma Linda University Medical Center. Plaintiff, unconscious and suffering from seizures, was treated for severe head trauma and was given a craniectomy, in which a portion of the skull is removed in order to relieve pressure on the brain caused by swelling. Plaintiff suffered subdural hematoma, cerebral edema, and subfalcine herniation caused by intracranial pressure. A consulting forensic pediatrician determined that the injuries were caused by child abuse, most likely "shaken baby syndrome."

Plaintiff filed a complaint, through his mother Lauri H. as guardian ad litem, against the County of San Bernardino, the City of Yucaipa, Deputy Swanson, Sergeant Bohner (collectively, defendants), and Sharples.[2] The complaint alleged two causes of action against defendants: (1) breach of a public entity's mandatory duty to report or cross-report child abuse allegations, under Government Code section 815.6, and (2) negligence by an employee within the scope of employment, under Government Code section 815.2, subdivision (a).

---

[2] The complaint's third cause of action involved only Sharples. Sharples failed to answer the complaint and a default was entered against him.

5

Defendants filed a motion for summary judgment on the ground they did not breach a mandatory statutory duty owed to plaintiff and were entitled to governmental immunities under Government Code sections 815.2, subdivision (b), 820.2, and 821.6. The trial court found that because the decision not to cross-report was based on the officer's investigatory findings and her discretionary determination of no child abuse, defendants were immune from liability. It granted the motion for summary judgment.

In an unpublished opinion, the Court of Appeal affirmed the trial court's order granting the summary judgment motion. The court held that Deputy Swanson, having conducted an investigation, was not required under section 11166, subdivision (a), to report the child abuse allegations to the child welfare agency because she concluded "there was no child abuse." The court reasoned that because the officer's decision not to report was based on her "judgment, expertise and discretion" and was "tantamount to a decision not to prosecute, where it was the product of an investigation," her investigation was immunized under Government Code section 821.6. It determined that, consequently, the Sheriff's Department was not vicariously liable under Government Code section 815.2, subdivision (b). The Court of Appeal further held that the Sheriff's Department did not have a separate and independent mandatory duty to cross-report under Penal Code section 11166, subdivision (k) and therefore was not directly liable as a public entity under Government Code section 815.6.

We granted plaintiff's petition for review to decide whether Deputy Swanson and the Sheriff's Department had mandatory duties to report and to cross-report under section 11166, subdivisions (a) and (k).

## DISCUSSION

CANRA sets forth several different reporting requirements once child abuse or neglect is suspected. (§ 11166.) Certain types of professionals known as

6

"mandated reporters" (§ 11165.7) "shall" report to law enforcement agencies or county welfare departments any known or suspected instance of child abuse or neglect. (§§ 11165.9, 11166, subd. (a).) "Any other person" "may" report to law enforcement agencies or county welfare departments any known or suspected instance of child abuse or neglect. (§§ 11165.9, 11166, subd. (g).) Certain designated agencies, such as a police department, sheriff's department, or county welfare department, "shall" accept such reports made by a "mandated reporter or another person." (§ 11165.9.) In addition, law enforcement agencies "shall" cross-report to the county welfare or probation department "every known or suspected instance of child abuse or neglect reported to it which is alleged to have occurred as a result of the action of a person responsible for the child's welfare." (§ 11166, subd. (k).) Reciprocal duties of cross-reporting to law enforcement agencies are imposed on the county welfare or probation department. (§ 11166, subd. (j).)

Plaintiff claims that the Court of Appeal's decision was incorrect in several respects. First, he argues that section 11166, subdivision (k) imposed on the Sheriff's Department an independent and mandatory duty to inform the child welfare agency of the initial 911 report, which was separate from Deputy Swanson's duty to investigate and cross-report. Second, he argues that section 11166, subdivision (a) imposed on Deputy Swanson, as a mandated reporter, a duty to report an objectively reasonable suspicion of child abuse. Plaintiff contends that because the parties disagreed on the appearance of plaintiff when Deputy Swanson examined him, the reasonableness of her conclusion of no child abuse presented a disputed issue of material fact. On the other hand, defendants argue that plaintiff forfeited the section 11166, subdivision (k) claim for failing to raise the issue below. In any event, they assert, the Court of Appeal correctly concluded that they are immune from liability.

7

## A.  Standard of Review

" 'This case comes to us on review of a summary judgment.  Defendants are entitled to summary judgment only if "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." [Citation.] To determine whether triable issues of fact do exist, we independently review the record that was before the trial court when it ruled on defendants' motion. [Citations.] In so doing, we view the evidence in the light most favorable to plaintiffs as the losing parties, resolving evidentiary doubts and ambiguities in their favor.' " (*Elk Hills Power, LLC v. Board of Equalization* (2013) 57 Cal.4th 593, 605-606.)

## B.  California Government Claims Act

Under the California Government Claims Act (Gov. Code, § 810 et seq.), governmental tort liability must be based on statute.  "Except as otherwise provided by statute:  [¶]  [a] public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person." (Gov. Code, § 815, subd. (a)); see *Miklosy v. Regents of University of California* (2008) 44 Cal.4th 876, 899.)  Relevant to this case, Government Code section 815.6 provides a statutory exception to the general rule of public entity immunity:  "Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty." (Gov. Code, §  815.6.)

In *Guzman v. County of Monterey* (2009) 46 Cal.4th 887 (*Guzman*), we explained that Government Code section 815.6 has three elements that must be satisfied to impose public entity liability:  (1) a mandatory duty was imposed on the public entity by an enactment; (2) the enactment was designed to protect

8

against the particular kind of injury allegedly suffered; and (3) the breach of the mandatory statutory duty proximately caused the injury.  Even when a duty exists, California has enacted specific immunity statutes that, if applicable, prevail over liability provisions.  (*Creason v. Department of Health Services* (1998) 18 Cal.4th 623, 635.)  The first question always is whether there is liability for breach of a mandatory duty.  (*Creason*, at p. 630.)  If there is no liability, the issue of immunity never arises.  (*Ibid*.; *Guzman*, at p. 911, fn. 16.)

In addition to liability under Government Code section 815.6, the complaint alleged that defendants were negligent under Government Code section 815.2. Section 815.2 provides:  "(a) A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative. [¶]  (b) Except as otherwise provided by statute, a public entity is not liable for an injury resulting from an act or omission of an employee of the public entity where the employee is immune from liability."

Generally, a public employee is "liable for injury caused by his act or omission to the same extent as a private person."  (Gov. Code, § 820, subd. (a).) However, as relevant here, "a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused."  (Gov. Code, § 820.2.)  In addition, "[a] public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, even if he acts maliciously and without probable cause." (Gov. Code, § 821.6.)

### C. Section 11166, Subdivision (k)

We first determine whether section 11166, subdivision (k) imposed on the Sheriff's Department an independent and mandatory duty to inform the child welfare agency of the initial 911 report.[3]

The first element of liability under Government Code section 815.6 requires that " 'the enactment at issue be *obligatory*, rather than merely discretionary or permissive, in its directions to the public entity; it must *require*, rather than merely authorize or permit, that a particular action be taken or not taken. [Citation.] It is not enough, moreover, that the public entity or officer have been under an obligation to perform a function if the function itself involves the exercise of discretion. [Citation.]' [Citation.] Courts have construed this first prong rather strictly, finding a mandatory duty only if the enactment 'affirmatively

---

[3] Preliminarily, defendants claim that plaintiff has forfeited the issue relating to the direct liability of the county agencies, pursuant to Penal Code section 11166, subdivision (k) because he failed to raise it in the trial court. Our review of the record reveals that plaintiff properly raised the issue in the trial court. In the complaint, plaintiff pleaded a cause of action based on the direct liability of the county agencies under Government Code section 815.6 and alleged that they breached their mandatory duties pursuant to section 11166, subdivision (k). Plaintiff raised the same argument in his opposition to defendants' motion for summary judgment, in his opposition to the defendants' proposed order, and during the summary judgment hearing. Significantly, defendants responded on the merits to plaintiff's claim in their reply to plaintiff's opposition to defendants' motion for summary judgment.

Defendants further argue that plaintiff failed to raise the Penal Code section 11166, subdivision (k) claim in his government claim and thus, failed to comply with the procedures required by Government Code sections 945.4 and 945.6. Although defendants asserted, as an affirmative defense, the failure to comply with government claims procedures in their answer, they did not raise that defense as a basis for the grant of summary judgment.

Finally, in this court, defendants failed to file an answer to the petition for review requesting that we limit the issues by excluding the one related to section 11166, subdivision (k). Consequently, that issue is properly before us.

imposes the duty and provides implementing guidelines.' " (*Guzman, supra,* 46 Cal.4th at p. 898.)

" 'Whether a particular statute is intended to impose a mandatory duty, rather than a mere obligation to perform a discretionary function, is a question of statutory interpretation for the courts.' [Citations.] We examine the 'language, function and apparent purpose' of each cited enactment 'to determine if any or each creates a mandatory duty designed to protect against' the injury allegedly suffered by plaintiff." (*Guzman*, *supra*, 46 Cal.4th at p. 898.)

Section 11166, subdivision (k) provides: "A law enforcement agency *shall immediately, or as soon as practicably possible, report* by telephone, fax, or electronic transmission to the agency given responsibility for investigation of cases under Section 300 of the Welfare and Institutions Code and to the district attorney's office *every known or suspected instance* of child abuse or neglect *reported to it*, except acts or omissions coming within subdivision (b) of Section 11165.2, which shall be reported only to the county welfare or probation department. A law enforcement agency *shall report* to the county welfare or probation department *every known or suspected* instance of child abuse or neglect *reported to it which is alleged* to have occurred as a result of the action of a person responsible for the child's welfare, or as the result of the failure of a person responsible for the child's welfare to adequately protect the minor from abuse when the person responsible for the child's welfare knew or reasonably should have known that the minor was in danger of abuse. A law enforcement agency also *shall* send, fax, or electronically transmit a written report thereof *within 36 hours of receiving the information concerning the incident* to any agency to which it makes a telephone report under this subdivision." (Italics added.)

Section 11166, subdivision (k) imposes an obligatory duty, and not merely a discretionary or permissive authorization, upon law enforcement agencies to

11

cross-report the child abuse or neglect reports that it receives. First, the plain language of the statute commands that a law enforcement agency "*shall* immediately, or as soon as practicably possible, report . . . every known or suspected instance of child abuse or neglect reported to it." (§ 11166, subd. (k), italics added.) Regarding persons responsible for the child's welfare, the statute directs that a law enforcement agency "*shall* report . . . every known or suspected instance of child abuse or neglect reported to it which is *alleged* to have occurred." (*Ibid*., italics added.)

The term "child abuse or neglect" is clearly defined. (§§ 11165.1, 11165.2, 11165.3, 11165.4, 11165.6.) Although in some instances it may require the exercise of judgment to identify whether a report involves child abuse or neglect, such a determination does not involve the exercise of discretion. Deciding if conduct falls into a defined category does not require the consideration of a host of potentially competing factors that is the hallmark of discretion.

In addition, subdivision (k) sets forth implementing guidelines. The law enforcement agency is required initially to cross-report instances of child abuse "immediately, or as soon as practicably possible . . . by telephone, fax, or electronic transmission" to a child welfare agency, and then submit a "written report" within "36 hours of receiving the information" if it initially made a telephone report. (§ 11166, subd. (k).)

Second, within section 11166 itself, the Legislature used both the words "shall" and "may," depending on the duties imposed on various persons and governmental agencies. For example, section 11166, subdivision (a) provides that mandated reporters, various designated professionals (§ 11165.7), "shall" report to law enforcement agencies, county probation departments, or county welfare departments any known or suspected instance of child abuse or neglect. (§§ 11165.9, 11166, subd. (a).) On the other hand, section 11166, subdivision (g)

12

provides that "[a]ny other person" (i.e., nonmandated reporters) "may" report to those same agencies any known or suspected instance of child abuse or neglect. Similarly, section 11166, subdivision (h) provides that if two or more persons are required to report a known or suspected instance of child abuse or neglect, a single report "may" be made by one person by mutual agreement. It further provides that if any of those persons knows that the designee has failed to report, he or she "shall" make the report. Further, section 11166, subdivision (d)(3)(A) provides that clergy members "may" report to those same agencies any known or suspected instance of child sexual abuse. Moreover, another section of CANRA, section 11165.9, states that designated agencies (i.e., police, sheriff's, probation, or welfare departments) "shall accept a report of suspected child abuse or neglect whether offered by a mandated reporter or another person." These provisions indicate that the Legislature was aware of the difference between the two terms "shall" and "may," using the term "shall" to convey an obligatory requirement and "may" to indicate merely a discretionary or permissive authorization.

Although the use of the word "shall" does not necessarily determine the mandatory nature of the duty imposed (*Guzman, supra*, 46 Cal.4th at p. 899), the statute's legislative history further indicates the Legislature's intent to impose a mandatory duty on law enforcement to inform other designated agencies of its receipt of child abuse or neglect reports. Also, regarding the second prong of *Guzman*'s test, the legislative history reflects that the duty described in section 11166, subdivision (k) was designed to protect against the particular kind of injury plaintiff suffered in this case.

The purpose of CANRA, of which section 11166, subdivision (k) is a part, is to protect children from abuse and neglect. (§ 11164, subd. (b).) California's child abuse reporting law was reenacted in 1980 to overhaul an earlier reporting scheme, with the goal of "increasing the likelihood that child abuse victims would

13

be identified.  (Stats. 1980, ch. 1071, § 4, pp. 3420 et seq.)" (*Ferraro v. Chadwick* (1990) 221 Cal.App.3d 86, 90.)  The Legislature explained that "[i]n reenacting the child abuse reporting law, it is the intent of the Legislature to clarify the duties and responsibilities of those who are required to report child abuse.  The new provisions are designed to foster cooperation between child protective agencies and other persons required to report.  Such cooperation will insure that children will receive the collective judgment of all such agencies and persons regarding the course to be taken to protect the child's interest."  (Stats. 1980, ch. 1071, § 5, p. 3425.)

The Attorney General, the drafter of the bill, had emphasized the need for cooperation and communication between law enforcement and child welfare agencies.  At an interim hearing before the Assembly Committee on Criminal Justice, Deputy Attorney General Michael Gates testified that "if a policeman or social worker makes that decision [to investigate] by themselves, they do not have the expertise that is required by all of these agencies collectively to make that decision.  [¶] . . . [¶]  I want alternative reporting in the sense that either agency, if the police gets the report first, we provide that they immediately advise [child welfare services], and vice versa.  If [child welfare services] gets it, they immediately advise the police."  (Assem. Com. on Criminal Justice, transcript of hearing, "Child Abuse Reporting" (Nov. 21, 1978) pp. 7, 11 (Transcript of Assembly Public Hearing).)

Thus, the legislative history reflects that the Legislature, in reenacting the child abuse reporting law, intended to rectify the problem of inadequate child abuse reporting by mandating cross-reporting between law enforcement and child welfare agencies.  (See *Krikorian v. Barry* (1987) 196 Cal.App.3d 1211, 1217 (*Krikorian*).)  Moreover, courts have understood the reporting scheme to be mandatory.  For example, in explaining the mandatory nature of the reporting

14

scheme, the court in *Planned Parenthood Affiliates v. Van de Kamp* (1986) 181 Cal.App.3d 245 (*Planned Parenthood*), stated: "The child protective agency receiving the initial report must share the report with all its counterpart child protective agencies by means of a system of cross-reporting. An initial report to probation or welfare department is shared with the local police or sheriff's department, and vice versa. Reports are cross-reported in almost all cases to the office of the district attorney. . . . [¶] A child protective agency receiving the initial child abuse report then conducts an investigation. The Legislature intends an investigation be conducted on every report received." (*Id*. at pp. 259-260; see *James W. v. Superior Court* (1993) 17 Cal.App.4th 246, 254 [reciprocal duties of law enforcement and county welfare departments to cross-report immediately or as soon as practicably possible after receiving initial report of suspected child abuse].)

The Court of Appeal improperly linked the duties designated in section 11166, subdivision (k) with those designated in subdivision (a) of that section. Subdivision (a) requires mandated reporters, which includes a police officer or sheriff's deputy (§ 11165.7, subd. (a)(34)), to report any known or suspected instance of child abuse or neglect to law enforcement agencies or child welfare agencies (§ 11165.9).[4]

---

[4] Subdivision (a) of section 11166 states, in relevant part: "a mandated reporter shall make a report to an agency specified in Section 11165.9 whenever the mandated reporter, in his or her professional capacity or within the scope of his or her employment, has knowledge of or observes a child whom the mandated reporter knows or reasonably suspects has been the victim of child abuse or neglect. The mandated reporter shall make an initial report by telephone to the agency immediately or as soon as is practicably possible, and shall prepare and send, fax, or electronically transmit a written followup report within 36 hours of receiving the information concerning the incident. The mandated reporter may

*(footnote continued on next page)*

15

The Court of Appeal concluded that a law enforcement agency's duty to cross-report under section 11166, subdivision (k) depends, not just on the receipt of a child abuse or neglect report, but on its employee's fulfillment of its duties under section 11166, subdivision (a). The court reasoned that subdivision (a) imposes both a duty on the officer to report and investigate, and that a law enforcement agency's and an officer's reporting duties do not arise in the absence of an investigation, since such a report depends on the officer's investigative findings. In other words, "the duty to cross-report [under section 11166, subdivision (k)] arises only after an investigation results in the determination that abuse is known or that it is objectively reasonable for a person to entertain a suspicion, based on facts that could cause a reasonable person to suspect child abuse or neglect. (Pen. Code, § 11166, subd. (a)(1).)"

The Court of Appeal incorrectly determined that a law enforcement agency's duty to cross-report under section 11166, subdivision (k) is contingent on its employee's duty, arising as a mandated reporter, to report and investigate under subdivision (a). First, the language of section 11166, subdivisions (k) and (a) reflects that the duties specified in each provision are not dependent on each other and are not the same. Section 11165.9 specifies that law enforcement agencies and the county welfare department "shall accept a report of suspected child abuse or neglect whether offered by a mandated reporter or another person, or referred by another agency." In turn, section 11166, subdivision (k) requires law enforcement agencies to cross-report to other agencies those reports *received* by

<hr>

*(footnote continued from previous page)*

include with the report any nonprivileged documentary evidence the mandated reporter possesses relating to the incident."

16

them from mandated reporters or another person (i.e., nonmandated reporters).  (§ 11166, subds. (a), (k), (g).)

On the other hand, section 11166, subdivision (a) requires mandated reporters to *make* reports of known or suspected instances of child abuse or neglect to the agencies specified in section 11165.9.  The definition of a mandated reporter consists of a list of 44 classes of professionals, including teachers, health practitioners, coroners, clergy members, and police officers, who are, broadly, "individuals whose professions bring them into contact with children."  (*Planned Parenthood*, *supra*, 181 Cal.App.3d at p. 258; see § 11165.7.)  Contrary to the Court of Appeal's assertion, a law enforcement agency's duty to cross-report under section 11166, subdivision (k) is contingent only on *receipt* of a child abuse report, including those reports made by a police officer in his or her capacity as a mandated reporter.  Such reports are made if the mandated reporter, not the law enforcement agency, "knows or reasonably suspects [a child] has been the victim of child abuse or neglect."  (§ 11166, subd. (a).)

Second, nothing in section 11166, subdivision (k) indicates that a law enforcement agency must first investigate the matter before cross-reporting an initial report of abuse.  Neither subdivision (a) nor subdivision (k) of section 11166 states that the duty to report and cross-report arises only after the completion of an investigation.  Both subdivisions (a) and (k) specify that a mandated reporter or law enforcement agency can make an initial report by telephone immediately or as soon as practicably possible, and must then follow up with a written report within 36 hours of receiving the information concerning the incident.  This timeframe is clearly insufficient to conduct and complete an investigation.  Moreover, many of the professionals who are mandated reporters, such as doctors, coroners, or teachers, do not have the capacity to conduct followup investigations of known or suspected child abuse or neglect.

17

Third, other provisions of CANRA specify different obligations and procedures for the reporting of investigations. (§§ 11166.3, subd. (a), 11169, subd. (a).) These provisions indicate that a law enforcement agency's duty to cross-report the receipt of an initial child abuse or neglect report is separate from its investigative duties.

The statutory provisions considered as a whole reflect that the Legislature intended that the various law enforcement and child welfare agencies immediately communicate to each other information received on alleged child abuse or neglect so that they may in turn coordinate their investigative procedures. (§ 11166.3, subd. (a); Cal. Code Regs, tit. 11, § 900.) Here, it is undisputed that the Sheriff's Department did not cross-report the initial 911 report of child abuse made by Kinney, a nonmandated reporter. The Court of Appeal affirmed the trial court's grant of summary judgment, concluding that the county defendants were not liable under Government Code section 815.6 because Penal Code section 11166, subdivision (k) does not create a mandatory duty that is separate and independent from the officer's duty to report. Accordingly, the Court of Appeal incorrectly ruled on the first two *Guzman* elements.

### D. Section 11166, Subdivision (a)

In his opening and reply briefs, plaintiff contends that Deputy Swanson, as a mandated reporter, had a mandatory duty, under section 11166, subdivision (a) both (1) to report Kinney's 911 report of child abuse to a child welfare agency and (2) to investigate and report her investigative findings, including her observations, to a child welfare agency because it was objectively reasonable to suspect child abuse. In their answer brief, defendants agree that Deputy Swanson had a mandatory duty, under section 11166, subdivision (a), to investigate Kinney's report of child abuse, but that because her investigatory findings were subject to

18

her discretion, her decision not to report was immune from liability. The Court of Appeal agreed with defendants as to the applicability of section 11166, subd. (a). However, contrary to the parties' and the court's underlying premise, section 11166, subdivision (a) does not require a law enforcement officer conducting an investigation of an initial report of child abuse that has been received by an agency to make additional reports about the same incident.

Section 11166, subdivision (a) requires a mandated reporter to make a report to a law enforcement agency or a county welfare department "whenever the mandated reporter, in his or her professional capacity or within the scope of his or her employment, has knowledge of or observes a child whom the mandated reporter knows or reasonably suspects has been the victim of child abuse or neglect." A mandated reporter has a "reasonable suspicion" when "it is objectively reasonable for a person to entertain a suspicion, based upon facts that could cause a reasonable person in a like position, drawing, when appropriate, on his or her training and experience, to suspect child abuse or neglect. 'Reasonable suspicion' does not require certainty that child abuse or neglect has occurred nor does it require a specific medical indication of child abuse or neglect; any 'reasonable suspicion' is sufficient." (§ 11166, subd. (a)(1).)

The Court of Appeal agreed with the parties that section 11166, subdivision (a) imposes a duty to investigate, but concluded that it does not create a mandatory duty "to take further action" (i.e., to report) where child abuse is not suspected. It reasoned that Deputy Swanson's decision not to report was grounded on her "judgment, expertise and discretion" and was "tantamount to a decision to not prosecute, where it was the product of an investigation." It further noted that "[h]aving investigated the incident, it was objectively reasonable for Deputy Swanson to conclude the situation did not involve child abuse, even if that conclusion, in the exercise of Deputy Swanson's judgment, was in error."

19

Plaintiff responds that the Court of Appeal incorrectly used a subjective standard to conclude that Deputy Swanson had no duty to report because she personally did not suspect child abuse. He contends that discretionary immunity is inapplicable where an officer has a mandatory duty to report based on an objective standard. Plaintiff argues that because the extent of his injuries when Deputy Swanson saw him was in dispute, there was a material issue of fact as to whether a reasonable person in Swanson's position would have suspected child abuse or neglect.

The parties' and the court's underlying assumption — that section 11166, subdivision (a) applies when an officer follows up on a reported incident of child abuse — is based on *Alejo v. City of Alhambra* (1999) 75 Cal.App.4th 1180 (*Alejo*).[5] There, the plaintiff sued the City of Alhambra and one of its police officers for the negligent failure to investigate or report child abuse under CANRA. The plaintiff's father, suspecting that the plaintiff's mother and her boyfriend were abusing the plaintiff, went to the police to report the matter. The police department and the officer who spoke with the father failed to cross-report the father's initial report to other governmental agencies and to conduct any

---

[5]     Plaintiff never contested that Deputy Swanson was acting as an investigating officer within the meaning of CANRA, until after the parties filed their initial briefs when we asked for supplemental briefing on whether Alejo should be disapproved. (See post, p. 22, fn. 6.) Here, the trial court found that Deputy Swanson was investigating the third party report of suspected child abuse. Similarly, the Court of Appeal opinion stated, "it is undisputed that Deputy Swanson investigated the report of suspected abuse." In the Court of Appeal, plaintiff filed a rehearing petition and contested several statements in the opinion as misstatements of fact and others as misstatements of law. However, he did not contest the statement about Deputy Swanson's investigative duties in this case. Indeed, his arguments up until he changed his position were predicated on the point that Deputy Swanson was dispatched to investigate Kinney's 911 report, under section 11166, subdivision (a).

investigation into the alleged abuse.  Six weeks later, the mother's boyfriend severely beat the plaintiff.  (*Id.* at pp. 1183-1184.)

Addressing an earlier, similar version of section 11166, subdivision (a) (as amended by Stats. 1996, ch. 1081, § 3.5, p. 7410), the *Alejo* court held that that provision imposed two mandatory duties on law enforcement officers who received a report of child abuse: (1) "a duty to investigate" and (2) "a duty to take further action when an objectively reasonable person in the same situation would suspect child abuse." (*Alejo, supra*, 75 Cal.App.4th at p. 1186.)  The court acknowledged that former section 11166, subdivision (a) did not use the term "investigate."  However, it reasoned that the statute "clearly envisions some investigation in order for an officer to determine whether there is reasonable suspicion to support the child abuse allegation and to trigger a report to the county welfare department and the district attorney" and "to the Department of Justice under section 11169, subdivision (a)." (*Alejo,* at p. 1186.)  The court noted that "[a]n officer is only required to investigate and report an account of child abuse when ' . . . it is objectively reasonable for a person to entertain a suspicion,' " and need not "pass on an 'unfounded report,' i.e., one which he or she determines to be false" as defined by the statute.  (*Alejo,* at pp. 1188-1189.)

The *Alejo* court held that the trial court erred in sustaining the defendants' demurrer without leave to amend; the plaintiff's complaint pled a cause of action for the negligent failure to investigate or report under former section 11166, subdivision (a).  (*Alejo, supra*, 75 Cal.App.4th at p. 1184.)

*Alejo* conflates an officer's mandatory reporting duties with those of an officer investigating a reported instance of alleged child abuse or neglect.  It failed to recognize that there is "a dichotomy between reporter and reportee, i.e., differentiating between those who make the initial report and the officials who come later" in performing their investigatory or prosecutorial functions.  (*James*

21

*W. v. Superior Court, supra*, 17 Cal.App.4th at p. 257.)  As noted above,

"mandated reporter" includes 44 classes of professionals, most of whom are not

involved in and lack the capacity to perform law enforcement activities, including

investigations.  (§ 11165.7.)  Accordingly, section 11166, subdivision (a) only

requires mandated reporters to *make* reports if the reporter, in his or her

professional capacity or within the scope of his or her employment, knows or

reasonably suspects child abuse or neglect.  There is no requirement of a followup

investigation to confirm any suspicions.  (*People ex rel. Eichenberger v. Stockton*

*Pregnancy Control Medical Clinic, Inc.* (1988) 203 Cal.App.3d 225, 239-240

["nothing in the Act requires professionals such as health care practitioners to

obtain information they would not ordinarily obtain in the course of providing care

or treatment"]; see *People v. Davis* (2005) 126 Cal.App.4th 1416, 1426 (*Davis*)

["[t]he duty to investigate and the authority to determine whether abuse actually

did occur are vested in outside agencies," separate from mandated reporters].)[6]

---

[6]     We disapprove *Alejo v. City of Alhambra*, *supra*, 75 Cal.App.4th 1180, to
the extent it is inconsistent with this opinion.  In amending CANRA in 2000, the
Legislature declared: "This act is not intended to abrogate the case of Alejo v. City
of Alhambra (1999) 75 Cal.App.4th 1180." (Stats. 2000, ch. 916, § 34, p. 6838.)
The 2000 amendment clarified the various parties subject to the provisions of
CANRA.  (Stats. 2000, ch. 916, § 5, pp. 6813-6815.)  Similarly, in the 1980
enactment, the Legislature declared: "[I]n reenacting the Child Abuse Reporting
Law . . . , it is not the intent of the Legislature to alter the holding in the decision
of Landeros v. Flood (1976) 17 Cal.3d 399, which imposes civil liability for a
failure to report child abuse."  (Stats. 1980, ch. 1071, § 5, p. 3425.)  "Thus, in both
of these instances, the Legislature recognized case law that had permitted a civil
suit for injury to a child where there was a breach of the mandated reporter's duty
to report child abuse." (*All Angels Preschool/Daycare v. County of Merced* (2011)
197 Cal.App.4th 394, 405.)  From that brief statement regarding *Alejo*, it appears
that the Legislature was endorsing *Alejo* to the extent that it allowed such civil
suits in general and was not sanctioning all aspects of the opinion.  The
Legislature has also imposed criminal sanctions against mandated reporters for
failing to report.  (§ 11166, subd. (c) ["misdemeanor punishable by up to six

*(footnote continued on next page)*

In regard to investigating whether child abuse or neglect has occurred, the assessments of mandated reporters and the agencies receiving child abuse reports are not the same and are governed by different standards. As explained below, Deputy Swanson did not have a duty to report under section 11166, subdivision (a). Deputy Swanson, acting on behalf of the Sheriff's Department — as the recipient of a child abuse report made by a third party — was dispatched to fulfill the Sheriff's Department's function of investigating a specific reported incident of child abuse. Deputy Swanson's findings, observations, and duties regarding the investigation of the reported incident of abuse were not governed by section 11166, subdivision (a), but were instead governed by CANRA's provisions setting forth various obligations and procedures related to investigations.

The meaning and construction of a statute is a question of law, which we decide independently. (*People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 432.) We are required to harmonize the various parts of a statutory enactment by considering the particular section in the context of the statutory framework as a whole. (*Palos Verdes Faculty Assn. v. Palos Verdes Peninsula Unified School Dist.* (1978) 21 Cal.3d 650, 659.) Ordinarily, the words of the statute provide the most reliable indication of legislative intent. (*Pacific Gas & Electric Co. v. County of Stanislaus* (1997) 16 Cal.4th 1143, 1152.) However, a statute's literal terms will not be given effect if to do so would yield an unreasonable or mischievous result. (See *Friends of Mammoth v. Board of Supervisors* (1972) 8 Cal.3d 247, 259.)

---

*(footnote continued from previous page)*

months confinement in a county jail or by a fine of one thousand dollars ($1,000) or by both that imprisonment and fine"].)

CANRA defines "an employee of any police department, county sheriff's department, county probation department, or county welfare department" as a "mandated reporter," without any express exceptions. (§ 11165.7, subd. (a)(34).) Also, there is no dispute that Deputy Swanson was an employee of a county sheriff's department. Because Deputy Swanson is designated a mandatory reporter, but was dispatched to investigate a third party report of an instance of suspected child abuse (a task that most mandated reporters do not perform), there is an ambiguity in Deputy Swanson's role within CANRA's comprehensive statutory scheme. In such circumstances, we may consider CANRA's structure, goals, legislative history, and the wider historical circumstances of the statute's enactment and select the construction that comports most closely with the intent of the Legislature, with a view to promoting the general purpose of the statute and avoiding an interpretation that would lead to absurd consequences. (*Day v. City of Fontana* (2001) 25 Cal.4th 268, 272.)

CANRA was enacted to rectify the problem that many instances of child abuse were still going unreported. (*Krikorian, supra*, 196 Cal.App.3d at pp. 1216-1217; *Davis, supra*, 126 Cal.App.4th at p. 1428.) It "requires persons in positions where abuse is likely to be detected to report promptly all suspected and known instances of child abuse to authorities for follow-up investigation." (*Ferraro v. Chadwick, supra*, 221 Cal.App.3d at p. 90.) As noted above, the statutory framework imposes specific duties on mandated reporters to report known or suspected instances of child abuse within expedited timeframes and defines what must be reported, and when, how, and to whom it must be reported. (§§ 11166, subd. (a), 11167, subd. (a).) "Once a report is made, responsibilities shift and governmental authorities take over." (*James W. v. Superior Court, supra*, 17 Cal.App.4th at p. 254.) For example, CANRA imposes on law enforcement agencies the duty to cross-report reports they receive to other agencies. (§ 11166,

24

subd. (k).)  CANRA further contemplates that these agencies will, pursuant to their "existing duties," investigate reported incidents of suspected child abuse, and that they will notify other agencies when they commence their investigation. (§ 11166.3; cf. *Planned Parenthood, supra*, 181 Cal.App.3d at p. 259 [a "child protective agency receiving the initial child abuse report then conducts an investigation"].)  Oftentimes, reporting by third parties is the only way the proper authorities become aware of an incident of child abuse.  (Transcript of Assem. Public Hearing, *supra*, p. 17.)  In this way, the statutory scheme sets up "a dichotomy between reporter and reportee." (*James W. v. Superior Court, supra*, 17 Cal.App.4th at p. 257.)

June Sherwood, as the director of the Attorney General's crime prevention unit, worked with local government in the area of child abuse.  In the 1978 interim Assembly hearing, in support of enhanced reporting legislation, she explained that the role of law enforcement, as a child protective agency, in handling child abuse cases was the same as other child protective agencies, such as county welfare departments.  In emphasizing the importance of interagency cooperation in child abuse "decision-making," she stated:

"It is clear that it may not be appropriate in any instant case to respond with traditional crime and punishment approaches.  However, since the immediate protection of the child is the paramount concern and since early intervention is vital due to the recidivist and escalatory nature of the crime of child abuse, law enforcement must be involved in *decision-making* along with the other disciplines.  [¶]  Indeed, the nature of law enforcement's role and training brings unique qualifications to the handling of child abuse cases, and *which must be part of interagency decision making, particularly in the initial response*.  [¶]  Under California child abuse reporting statutes and law, police play a central role in crisis intervention and in initial investigation and handling of child abuse cases with the

25

following functions: [¶] 1. Protection of the child [¶] 2. Collection of evidence and investigation; and [¶] 3. Determination, with other agencies, of resources available in the community." (Transcript of Assem. Public Hearing, *supra*, p. 33, italics added.)

Ms. Sherwood further explained that law enforcement agencies are uniquely qualified to handle child abuse cases: (1) the "[p]olice are the only 24-hour field service child protective agency with investigatory and arrest authority," are "the only round-the-clock branch of government that can provide immediate response," and "are the only agency empowered to take a child into immediate protective custody"; (2) "[c]ompared to other involved disciplines, police are better trained to ensure constitutional rights and due process procedures in the investigation of cases"; and (3) "police response is immediate within a time frame of 3-30 minutes, whereas, because of public social worker heavy caseload and limited staff, their time response varies from within 2 hours to 2 days." (Transcript of Assem. Public Hearing, *supra*, pp. 34-35.)

In response, the Legislature defined a "child protective agency" as "a police or sheriff's department, a county probation department, or a county welfare department." (Stats. 1980, ch. 1071, § 4, pp. 3420, 3422, amending former § 11165, subd. (k).)[7] Thus, the Legislature considers law enforcement agencies,

---

[7] When reenacted in 1980, the child abuse reporting law required four categories of professionals to report known or suspected incidents of child abuse to a child protective agency: (1) child care custodians; (2) medical practitioners; (3) nonmedical practitioners; and (4) employees of a child protective agency. (Stats. 1980, ch. 1071, § 4, pp. 3421-3422, amending former §§ 11165, subds. (h)-(k), 11166, subd. (a).) Of these four broadly defined groups, only child protective agency employees performed the agency function of investigating specific reported incidents of child abuse.

In 2000, the Legislature reorganized and recast the list of specified persons required to report by designating them as mandated reporters and defining them by

*(footnote continued on next page)*

along with child welfare agencies, to be child protective agencies that are designated to accept reports of child abuse (§ 11165.9) and to investigate child abuse reports (§ 11166.3).

The Courts of Appeal have held that the decisions of child welfare agency employees — regarding determinations of child abuse, the potential risk to a child, placement of a child, removal of a child, and other resultant actions — are subjective *discretionary* ones that are incidental to the employees' investigations. (See, e.g., *Christina C. v. County of Orange* (2013) 220 Cal.App.4th 1371, 1381; *Ortega v. Sacramento County Dept. of Health & Human Services* (2008) 161 Cal.App.4th 713, 727-728 (*Ortega*); *Jacqueline T. v. Alameda County Child Protective Services* (2007) 155 Cal.App.4th 456, 468 (*Jacqueline T.*); *Alicia T. v. County of Los Angeles* (1990) 222 Cal.App.3d 869, 882-883 (*Alicia T.*).)

These holdings are supported by the legislative history, as well as the statutory structure. Deputy Attorney General Gates explained that the determinations of child protective agency investigators about how to follow up on a report of a suspected incident of child abuse are governed by a subjective standard: "What you have by an investigating agency that receives a report, in every case a judgment call. Do I proceed informally and handle this thing and work with the family, or do I proceed formally? Do I proceed formally in a civil sense in terms of filing a [Welfare and Institutions Code section] 300d petition, or should the District Attorney file a complaint depending upon the seriousness of the injuries involved? All of these things have to be made by a collective judgment,

---

*(footnote continued from previous page)*

each individual occupation. (Stats. 2000, ch. 916, § 5, p. 6813; Legis. Counsel's Dig., Assem. Bill No. 1241 (1999-2000 Reg. Sess.) 6 Stats. 2000, Summary Dig., p. 422.)

27

and by having a complete, accurate index, a central index, then this assists those people who make judgments in terms of how they are going to proceed with that judgment." (Transcript of Assem. Public Hearing, *supra*, pp. 43-44.)

The statutory provisions reflect that when an employee of a child protective agency is dispatched to investigate a child abuse incident report received by the agency, the various provisions governing reporting by child protective agencies apply. The child protective agency then has a duty to report to other child protective agencies that it is investigating the case within 36 hours after *starting* its investigation. (§ 11166.3, subd. (a).) Under the version of CANRA in effect at the time of the incident at issue here, the investigating agency was required to report its investigative findings to the Department of Justice if it determined the child abuse or neglect allegations not to be "unfounded, as defined in Section 11165.12." (§ 11169, former subd. (a), as amended by Stats. 2004, ch. 842, § 17, p. 6410).)[8] Section 11165.12 defines reports as unfounded, substantiated, or inconclusive in terms of the investigator's subjective findings.[9]

---

[8] Current section 11169 states, in pertinent part:
"(a) An agency specified in Section 11165.9 shall forward to the Department of Justice a report in writing of every case it investigates of known or suspected child abuse or severe neglect that is determined to be substantiated . . . . An agency shall not forward a report to the Department of Justice unless it has conducted an active investigation and determined that the report is substantiated, as defined in Section 11165.12. . . .
"(b) On and after January 1, 2012, a police department or sheriff's department specified in Section 11165.9 shall no longer forward to the Department of Justice a report in writing of any case it investigates of known or suspected child abuse or severe neglect. . . ."
[9] Section 11165.12 states:
"As used in this article, the following definitions shall control:
"(a) 'Unfounded report' means a report that is determined by the investigator who conducted the investigation to be false, to be inherently

*(footnote continued on next page)*

28

Nevertheless, there is a tension in the statutory scheme; employees of child protective agencies, who perform investigatory functions on behalf of their employer, are designated mandatory reporters. (§ 11165.7, subd. (a)(34).) Mandated reporters have *mandatory* reporting duties which are governed by an objective standard. (§ 11166, subd. (a); *Krikorian*, *supra,*196 Cal.App.3d at pp. 1216-1217.) That is, "the duty to report arises not on the basis of the mandated reporter's personal assessment of the facts known to her, but on the basis of what a reasonable person would suspect based on those facts." (*Davis, supra*, 126 Cal.App.4th at p. 1430 [duties of mandated reporter under elder abuse law and CANRA are the same].) "[W]hen circumstances giving rise to a reasonable suspicion of abuse exist, the Act does not permit a mandated reporter to investigate and determine that no abuse *occurred . . . .* [T]he existence of such circumstances triggers the mandatory duty to report the circumstances to a designated outside agency. *It is the responsibility of the outside agency to*

---

*(footnote continued from previous page)*

improbable, to involve an accidental injury, or not to constitute child abuse or neglect, as defined in Section 11165.6.

"(b) 'Substantiated report' means a report that is determined by the investigator who conducted the investigation to constitute child abuse or neglect, as defined in Section 11165.6, based upon evidence that makes it more likely than not that child abuse or neglect, as defined, occurred. A substantiated report shall not include a report where the investigator who conducted the investigation found the report to be false, inherently improbable, to involve an accidental injury, or to not constitute child abuse or neglect as defined in Section 11165.6.

"(c) 'Inconclusive report' means a report that is determined by the investigator who conducted the investigation not to be unfounded, but the findings are inconclusive and there is insufficient evidence to determine whether child abuse or neglect, as defined in Section 11165.6, has occurred."

29

*investigate all reports of suspected abuse and to determine whether abuse occurred."* (*Id.* at pp. 1431-1432, italics added, fn. omitted.)

The Legislature imposed an objective standard — while granting concomitant broad immunities for those mandated reporters who report suspected instances of child abuse — to rectify the problem of inadequate child abuse reporting, to broaden the circumstances under which reporting is required, and to encourage mandated reporters to report reasonable suspicions of child abuse. (§ 11172, subd. (a) [providing absolute immunity for mandated reporters who report]; *Davis, supra*, 126 Cal.App.4th at p. 1429; *Krikorian, supra,* 196 Cal.App.3d at pp. 1217, 1219.) After commenting on the problem of under-reporting, Deputy Attorney General Gates testified that "we have to rely on third parties reporting child abuse who come into contact with children and are able to observe potential injuries and potential cases of child abuse. So, it is imperative that third parties report, and it is imperative that they report completely and not just subjectively or let their own philosophy interfere with their legal duties." (Transcript of Assem. Public Hearing, *supra*, p. 4.)

We conclude that Deputy Swanson did not have a duty to file a report of a suspected incident of child abuse in this case for several reasons. First, imposing section 11166, subdivision (a)'s reporting duties on Deputy Swanson in the circumstance of this case would not further CANRA's goals. The Legislature intended that all reasonably suspected *instances* of child abuse be identified and reported to the designated local authorities and that they in turn be cross-reported to other designated agencies. (Legis. Counsel's Dig., Sen. Bill No. 781 (1979-1980 Reg. Sess.) 4 Stats. 1980, Summary Dig., p. 333; §§ 11166, subds. (a) [mandated reporter shall make "a written followup report within 36 hours of receiving the information concerning the *incident*" (italics added)], (k) [law enforcement agency shall report to other designated agencies "every known or suspected *instance* of child abuse or

30

neglect reported to it" (italics added)], (g) [nonmandated reporter "may report the known or suspected *instance* of child abuse or neglect" (italics added)], 11170, subd. (b) [Dept. of Justice required to notify reporting agency of any information relevant to the "known or suspected *instance* of child abuse or severe neglect" (italics added)], 11167, subd. (c) [information relevant to "*incident* of child abuse or neglect" may be given to licensing agency (italics added)]; see *James W., supra*, 17 Cal.App.4th at p. 255.)

Here, Kinney's 911 report notified the Sheriff's Department of the suspected *instance* or *incident* of child abuse. If the Sheriff's Department had cross-reported the incident to DCFS and the district attorney's office, as it was required to, all of the proper authorities would have been notified of that operative incident. In her investigation in response to the report, Deputy Swanson did not identify a different instance of child abuse, but gathered information concerning the one that had already been reported. Thus, the child welfare agency lacked awareness of the suspected incident of child abuse, not because it failed to receive Deputy Swanson's investigative report, but because the Sheriff's Department had failed in its cross-reporting duties. The Sheriff's Department was further required to notify the child welfare agency of its investigation within 36 hours after its inception. (§ 11166.3, subd. (a).) Once notified of the suspected child abuse incident, the child welfare agency was required to evaluate the report within 10 calendar days. (Welf. & Inst. Code, § 16501, subd. (f).) If DCFS had been notified of Kinney's initial report and the Sheriff's Department's investigation, it could have readily requested Deputy Swanson's investigative report as part of its evaluation.

Second, there would be other oddities in the statutory scheme if we were to conclude that a law enforcement officer investigating a report of suspected child abuse must file a report under section 11166, subdivision (a). Section 11170,

31

subdivision (b)(2) requires that on completion of the investigation, the investigating agency shall inform the mandated reporter of the results of the investigation and of any action the agency is taking with regard to the child or family. Certainly in some cases multiple actors and multiple agencies may be involved in an investigation and in the ultimate decision about what steps to take with regard to the child or family. But at least where an officer sees an investigation of a previously reported incident of child abuse through to its conclusion, the officer presumably would know the results of his or her own investigation and would not need notification by his or her own agency.

Third, Courts of Appeal have held that preliminary determinations of the potential risk to the child and the necessity of intervention made by employees of child protective agencies based on their investigative findings are not ministerial duties; these decisions are subjective, "involve a formidable amount of discretion" and are entitled to immunity. (*Ortega, supra*, 161 Cal.App.4th at p. 728; see *Jacqueline T., supra*, 155 Cal.App.4th at p. 468; *Christina C., supra*, 220 Cal.App.4th at p. 1381; see also *Thompson v. County of Alameda* (1980) 27 Cal.3d 741, 749 ["[t]he decision, requiring as it does, comparisons, choices, judgments, and evaluations, comprises the very essence of the exercise of 'discretion' "].) Otherwise, such employees' independence " 'would be compromised' " by their " 'constant[] fear that a mistake could result in a time-consuming and financially devastating civil suit.' " (*Alicia T., supra*, 222 Cal.App.3d at p. 880; *id*. at p. 881 ["state's interest in preventing child abuse will be diminished due to fear of retaliatory suits"].) Any benefit obtained from imposing liability on child protective agency personnel making discretionary decisions relating to the child's best interests must be carefully balanced against the burden of potential liability,

32

including the risk of being second-guessed years later in a lawsuit.[10] (See *Weirum v. RKO General, Inc.* (1975) 15 Cal.3d 40, 46 [foreseeable risk of harm "is a question of fact for the jury"]; *Storch v. Silverman* (1986) 186 Cal.App.3d 671, 678 ["issue of the reasonableness of the reporter's suspicions would potentially exist in every reported case"].)  We recognize that B.H.'s claim is based on an allegation that Deputy Swanson failed to make a *mandatory* report under a standard of *objective reasonableness*.  But the difference between the subjective, discretionary nature of decisions made in the course of following up on a reported incident of child abuse and the mandatory, objective nature of the section 11166, subdivision (a) reporting duty reinforces the point that Deputy Swanson was not required to report under subdivision (a) when she was dispatched in response to a previously reported incident of suspected child abuse.

Fourth, the different statutory immunities conferred on mandated reporters and on investigators demonstrate that the Legislature distinguished between the two separate functions of reporting and investigating an incident of abuse.  (See § 11172, subd. (a) [providing absolute immunity for mandated reporters from liability based on filing a report].)  The Court of Appeal opinions in *Newton v. County of Napa* (1990) 217 Cal.App.3d 1551 (*Newton*) and *James W., supra,* 17 Cal.App.4th 246 illustrate the scope of the distinction.

In *Newton, supra,* 217 Cal.App.3d at page 1558, officers of four county agencies, including the Napa County Sheriff's Department and Napa County Child

---

[10]    Deputy Attorney General Gates explained that the mandated reporter's liability for foreseeable injuries from the failure to report an objectively reasonable suspicion of child abuse or neglect "would be really after the fact when it was somehow discovered down the line that . . . by virtue of the fact there wasn't a report, the child went back into the home, was re-injured and somebody else reported it . . . ."  (Transcript of Assem. Public Hearing, supra, p. 13.)

33

Protective Services, went to the plaintiffs' house after receiving a report that the plaintiffs were abusing their children. The officials informed the plaintiffs they had come to investigate a child abuse report and took each of the children, without parental consent, to the bathroom where they were required to disrobe. They searched each child's body for signs of abuse, found no signs of abuse, and acknowledged to the plaintiffs that the report of child abuse was "unfounded." The plaintiffs sued the four county agencies for various causes of action in connection with the investigation of suspected child abuse.

The Court of Appeal held that the unqualified immunity conferred on mandated reporters, including those who are employees of child protective agencies (former § 11172, subd. (a), as amended by Stats. 1981, ch. 435, § 6, p. 1673), "extends only to persons reporting child abuse to governmental authorities; it does not apply to actions taken by officials who receive such reports of abuse. The duties and immunities of such officials are to be found rather in [different statutory provisions]." (*Newton, supra*, 217 Cal.App.3d at pp. 1558-1559.) Thus, the Court of Appeal recognized that law enforcement officers and child welfare agency employees perform different functions at various times and that their immunity — either as a mandated reporter or investigator — depends on the particular circumstances alleged to give rise to liability.

Similarly, in *James W, supra*, 17 Cal.App.4th at page 256, the Court of Appeal held that defendants, foster parents and a private family counselor, were not entitled to the absolute immunity afforded to mandated reporters. (Former § 11172, subd. (a), as amended by Stats. 1987, ch. 1459, § 23.) Although the defendants were designated reporters, they were not acting in that capacity — identifying or reporting child abuse — and thus, could not "take advantage of the reporting act immunity." (*James W, supra*, 17 Cal.App.4th at p. 256; see *id*. at pp. 253, fns. 10 & 11.) The Court of Appeal stated: "We believe recognition of a

34

dichotomy between reporter and reportee, i.e., differentiating between those who make the initial report and the officials who come later, is a healthy distinction." (*Id*. at p. 257.) Thus, the Court of Appeal recognized that law enforcement officers and child welfare agency employees perform both investigative and reporting functions and that their immunity turns on the specific acts or omissions alleged to have given rise to liability.

Finally, although Deputy Swanson did not have a duty to report in this case, we note that in other circumstances a law enforcement officer would have that duty with the concomitant obligations, liabilities, and immunities. Law enforcement officers, although considered to be employees of child protective agencies, have numerous duties other than investigating child abuse reports and determining a child's best interest based on that investigation. Deputy Swanson would be required to report in the first instance if she encountered a child while patrolling the streets or working a case for whom no report of suspected abuse or neglect had been made in a situation that would sustain an objectively reasonable suspicion of child abuse or neglect. For example, if Deputy Swanson were dispatched to investigate a reported residential burglary and observed evidence that would sustain an objective suspicion of child abuse, she would be required to report under section 11166, subdivision (a). Deputy Swanson also would have been required to report were she dispatched to investigate a report of a suspected incident of child abuse and observed evidence that would sustain an objective suspicion that a different, previously unreported incident or instance of child abuse had occurred. (Cf. *People v. Stritzinger* (1983) 34 Cal.3d 505, 513 [psychotherapist was "under no statutory obligation to make a second report" concerning previously reported incidents of abuse, but "[h]ad he learned . . . of possible further abuse — whether additional incidents involving [the same victim], or other incidents with another child — he would, of course, have been required to

35

report these new suspicions."].)  In turn, the Sheriff's Department would be required to cross-report under section 11166, subdivision (k).

The Court of Appeal reached the same result by a different route:  it concluded that although section 11166, subdivision (a) imposed a mandatory duty on Deputy Swanson to investigate, it did not impose a mandatory duty on her to report her investigative findings and conclusion of no child abuse.  Because Deputy Swanson did not have a mandatory duty to report under section 11166, subdivision (a), she is not directly liable under that statutory provision and thus, the county defendants are not derivatively liable under Government Code section 815.2, subdivision (a).  Accordingly, the trial court and Court of Appeal properly determined defendants were entitled to judgment as a matter of law regarding the negligence cause of action based on section 11166, subdivision (a).  Despite the Court of Appeal's flawed reasoning, it correctly affirmed the trial court's order granting summary judgment as to that cause of action.

## CONCLUSION

The Court of Appeal erred in affirming the trial court's grant of summary judgment as to the cause of action relating to Government Code section 815.6 and Penal Code section 11166, subdivision (k).  However, the Court of Appeal correctly affirmed the trial court's grant of summary judgment as to the cause of action relating to section 11166, subdivision (a).  Accordingly, we reverse its judgment in part, affirm its judgment in part, and remand to that court for further proceedings consistent with this opinion.

CHIN, J.

WE CONCUR:

CANTIL-SAKAUYE, C. J.
WERDEGAR, J.
CORRIGAN, J.
CUÉLLAR, J.
KRUGER, J.

37

**CONCURRING AND DISSENTING OPINION BY LIU, J.**


I agree with today's opinion that the Child Abuse and Neglect Reporting Act (CANRA) imposed on the San Bernardino County Sheriff's Department (Sheriff's Department) a mandatory duty to inform the county child welfare agency of Christy Kinney's 911 report of child abuse. (Pen. Code, § 11166, subd. (k); all undesignated statutory references are to this code.) But I do not agree that the officer sent to investigate the incident, Deputy Sheriff Kimberly Swanson, had no duty to report under section 11166, subdivision (a) (section 11166(a)).

There is no dispute that Deputy Swanson was a mandated reporter under CANRA. (§ 11165.7, subd. (a)(34).) Section 11166(a) provides that "a mandated reporter *shall* make a report to [a child protective agency] *whenever* the mandated reporter, in his or her professional capacity or within the scope of his or her employment, has knowledge of or observes a child whom the mandated reporter knows or reasonably suspects has been the victim of child abuse or neglect." (Italics added.) I would apply the unambiguous terms of section 11166(a) as written and conclude that Deputy Swanson was required to make a report if her observations of B.H. gave rise to a reasonable suspicion of child abuse.

Instead of following this straightforward analysis, today's opinion holds that section 11166(a) "does not require a law enforcement officer conducting an investigation of an initial report of child abuse that has been received by an agency

to make additional reports about the same incident." (Maj. opn., *ante*, at p. 19.) In so holding, the court departs from the plain language of the statute and fashions a judicially invented exception that no party to this litigation has urged.

"Ordinarily, the words of the statute provide the most reliable indication of legislative intent." (*Pacific Gas & Electric Co. v. County of Stanislaus* (1997) 16 Cal.4th 1143, 1152.) Today's opinion does not identify any ambiguous language in the reporting requirement of section 11166(a). Instead, the court says there is "a tension in the statutory scheme" due to the fact that "employees of child protective agencies, who perform investigatory functions on behalf of their employer, are designated mandatory reporters." (Maj. opn., *ante*, at p. 29.) The court then resolves the "tension" by holding that such employees, though designated as mandatory reporters, have no duty to report when investigating an already reported incident of suspected child abuse.

But the "tension" posited by the court exists only on the premise that a child protective agency employee who is following up on an initial report of suspected child abuse must be performing *either* an investigative function *or* a reporting function and cannot be performing both at the same time. The court makes four arguments in defense of this premise, but none is persuasive.

First, the court says "imposing section 11166, subdivision (a)'s reporting duties on Deputy Swanson in the circumstance of this case would not further CANRA's goals" because the Legislature intended only that "reasonably suspected *instances* of child abuse be identified and reported." (Maj. opn., *ante*, at p. 30; see *id.* at pp. 30–31 [citing CANRA's use of the terms "instance" and "incident" of child abuse].) "Here, Kinney's 911 report notified the Sheriff's Department of the suspected *instance* or *incident* of child abuse," and "Deputy Swanson did not identify a different instance of child abuse, but gathered information concerning the one that had already been reported." (Maj. opn., *ante*,

2

at p. 31.) Thus, the court contends, an additional report by Deputy Swanson would not further CANRA's goal of ensuring the identification and reporting of each suspected instance or incident of child abuse.

But the court's narrow reading of the purpose of reporting under CANRA is belied by the statute's reporting requirements, which go well beyond merely flagging each instance or incident of suspected child abuse. Section 11167, subdivision (a) requires mandated reports to include "the information that gave rise to the reasonable suspicion of child abuse or neglect and the source or sources of that information. If a report is made, the following information, if known, shall also be included in the report: the child's name, the child's address, present location, and, if applicable, school, grade, and class; the names, addresses, and telephone numbers of the child's parents or guardians; and the name, address, telephone number, and other relevant personal information about the person or persons who might have abused or neglected the child." In addition, "[a]ny mandated reporter who knows or reasonably suspects that the home or institution in which a child resides is unsuitable for the child because of abuse or neglect of the child shall bring the condition to the attention of the [child protective] agency" in the mandated report. (§ 11166, subd. (f).) The reporting form derived from this statute requires the mandated reporter to describe "what [the] victim said, . . . what the mandated reporter observed, . . . [and] what [the] person accompanying the victim(s) said . . . [or] similar or past incidents involving the victim(s) or suspect."

If the purpose of reporting under CANRA were only to flag each instance of suspected child abuse, there would have been no need for the statute to require such detailed information. The Legislature plainly intended the task of reporting to provide relevant agencies with all information known to a mandated reporter regarding an incident of suspected child abuse. This sensibly ensures that child

3

protective agencies will have the most complete information available when setting priorities, allocating resources, and conducting investigations.

Here, Deputy Swanson received the 911 dispatch report in which Kinney reported that B.H. "was at his father[']s house for the weekend and came home with bruises on his forehead." This was the extent of the information Deputy Swanson had about B.H.'s injuries when she arrived at the home. In her police report, Deputy Swanson wrote that B.H. had a "cut and bruising above his right eye. He also had small bruises, which appeared to be old, on his upper right arm and on his back." Even if the Sheriff's Department had reported the incident to the child welfare agency upon receiving the 911 call, as required by section 11166, subdivision (k), an additional mandated report with Deputy Swanson's observations (assuming those observations gave rise to reasonable suspicion of child abuse) would have advanced the informational objectives of the statutory reporting requirement.

Moreover, even accepting the court's view that CANRA's reporting requirements are concerned only with "instances" or "incidents" of child abuse, I would find the trial court's grant of summary judgment improper. Today's opinion says Deputy Swanson "would have been required to report were she dispatched to investigate a report of a suspected incident of child abuse and observed evidence that would sustain an objective suspicion that a different, previously unreported incident or instance of child abuse had occurred." (Maj. opn., *ante*, at p. 35.) As noted, Deputy Swanson's police report observed that B.H. "had small bruises, *which appeared to be old*, on his upper right arm and on his back." (Italics added; cf. *People v. Mills* (1991) 1 Cal.App.4th 898, 911 [bruises of various ages on a child is, among other indicators, evidence of past child abuse].) The presence of old bruises on B.H.'s body arguably gave rise to

4

reasonable suspicion of a *past* unreported incident of child abuse.  This triable issue of material fact precludes summary judgment.

Second, the court says it would be an "oddit[y]" if an officer dispatched to investigate a report of child abuse were herself required to make a report.  (Maj. opn., *ante*, at p. 32.)  "Section 11170, subdivision (b)(2) requires that on completion of the investigation, the investigating agency shall inform the mandated reporter of the results of the investigation and of any action the agency is taking with regard to the child or family."  (*Ibid.*)  Thus, "at least where an officer sees an investigation of a previously reported incident of child abuse through to its conclusion, the officer presumably would know the results of his or her own investigation and would not need notification by his or her own agency."  (*Ibid.*)

But this supposed oddity assumes that after an officer makes a mandated report, only that officer will initiate and complete an investigation.  Here, if Deputy Swanson had filed a mandated report on top of an initial mandated report filed by the Sheriff's Department, the child welfare agency might have opened its own investigation.  As the court notes, "multiple actors and multiple agencies may be involved in an investigation and in the ultimate decision about what steps to take with regard to the child or family."  (Maj. opn., *ante*, at p. 32.)  The results of the child welfare agency's investigation would provide helpful follow-up to the officer who made the mandated report, confirming or controverting the officer's own conclusion as to whether the initial report of suspect abuse was well founded.  There is nothing odd about this feedback loop.

Third, the court says that "preliminary determinations of the potential risk to the child and the necessity of intervention made by employees of child protective agencies based on their investigative findings are not ministerial duties; these decisions are subjective, 'involve a formidable amount of discretion' and are

5

entitled to immunity." (Maj. opn., *ante*, at p. 32.) This is true but beside the point. Even if Deputy Swanson, as a child protective agency employee, was performing investigative duties that required discretionary judgment entitled to immunity, she was also a mandated reporter with duties that did not require subjective judgment but rather an objective determination of reasonable suspicion. As the court notes, "B.H.'s claim is based on an allegation that Deputy Swanson failed to make a *mandatory* report under a standard of *objective reasonableness*" (maj. opn., *ante*, at p. 33); B.H. does not claim that Deputy Swanson failed to properly investigate.

Fundamentally, the court does not explain why Deputy Swanson could not have been subject to investigatory and reporting duties at the same time. In enacting CANRA, the Legislature was aware that law enforcement officers would have dual roles as investigators of reported incidents of child abuse and as mandated reporters obligated to file their own reports. If the Legislature had intended one role to take precedence over the other when an officer is following up on a reported incident of suspected child abuse, presumably it would have said so. But no such indication appears in the statute, and nothing suggests it is absurd or impossible for an officer to act in both capacities simultaneously. Indeed, no party in this case contends that Deputy Swanson, though a mandated reporter, had no duty to report in these circumstances. I would apply the plain text of section 11166(a) instead of inventing an exception to the statute as the court does today.

Finally, the court observes that "the different statutory immunities conferred on mandated reporters and on investigators demonstrate that the Legislature distinguished between the two separate functions of reporting and investigating an incident of abuse." (Maj. opn., *ante*, at p. 33.) But again, the fact that reporting and investigating are separate functions, with different standards governing an officer's duties, does not mean the exercise of one function precludes exercise of the other. And the fact that an officer's "immunity — either

6

as a mandated reporter or investigator — depends on the particular circumstances alleged to give rise to liability" (*id.* at p. 34) does not mean the officer must be understood to act in only one capacity at a time. An officer's entitlement to immunity as well as the scope of that immunity will depend on the officer's specific acts or omissions measured against the standards applicable to each duty, whether as investigator or as mandated reporter. (Compare *Newton v. County of Napa* (1990) 217 Cal.App.3d 1551, 1561–1562 [county was immune for conduct relating to investigation of reported child abuse] with § 11172, subd. (a) [absolute immunity for mandated reporters who comply with duties] and § 11166, subd. (c) [criminal liability for mandated reporters who do not comply with duties].) But there is no reason why more than one set of legal duties and immunities cannot govern an officer's conduct in this context at the same time.

To be sure, a straightforward application of section 11166(a) may result in the same instance of suspected child abuse being reported more than once. But CANRA contemplates a layered reporting system to protect children from abuse. For example, a mandated reporter who has reasonable suspicion of child abuse must make a report even if she has conveyed the information to her employer, supervisor, or another mandated reporter. (§ 11166, subd. (i)(3).) In addition, a mandated reporter must report even when another person who is not a mandated reporter has already done so. (§ 11166, subd. (g); cf. § 11166, subd. (h) [two or more mandated reporters who "jointly have knowledge" of a suspected instance of child abuse may form a "reporting team" and file "a single report"].) The potential benefit of this layered reporting system is apparent in this case: If Deputy Swanson had filed a mandated report, her report would have provided the child welfare agency with more information than what the 911 dispatch report contained.

7

On the facts here, it is arguable whether Deputy Swanson should have had a reasonable suspicion of child abuse.  For purposes of section 11166(a), " 'reasonable suspicion' means that it is objectively reasonable for a person to entertain a suspicion, based upon facts that could cause a reasonable person in a like position, drawing, when appropriate, on his or her training and experience, to suspect child abuse or neglect.  'Reasonable suspicion' does not require certainty that child abuse or neglect has occurred nor does it require a specific medical indication of child abuse or neglect; any 'reasonable suspicion' is sufficient." (§ 11166, subd. (a)(1).)  Applying this standard to what Deputy Swanson observed when she visited B.H., I believe there is a triable issue of material fact as to whether Deputy Swanson's observations gave rise to a reasonable suspicion of child abuse and, if so, whether she fulfilled her duty to report under section 11166(a).  Accordingly, I would reverse the grant of summary judgment in favor of Deputy Swanson and the Sheriff's Department.  Although the Court of Appeal held that Government Code section 821.6 immunized Deputy Swanson from any reporting liability, I see no need to opine on immunity in advance of a proper determination of whether Deputy Swanson did not comply with section 11166(a).

In all other respects, I join the court's opinion.


**L**IU**, J.**


8

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** B.H. v. County of San Bernardino

_____

**Unpublished Opinion** XXX NP opn. filed 7/25/13, 4th Dist., Div. 2
**Original Appeal**
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S213066
**Date Filed:** November 30, 2015

_____

**Court:** Superior
**County:** San Bernardino
**Judge:** Donald R. Alvarez

_____

**Counsel**

The Keane Law Firm, Christopher J. Keane; Esner, Chang & Boyer, Andrew N. Chang and Stuart B. Esner for Plaintiff and Appellant.

Tamara Lange; Keker & Van Nest, Jon Streeter for National Center for Youth Law, Advokids, Fresno Council on Child Abuse Prevention, Legal Advocates for Children and Youth, the National Association of Counsel for Children and G. Michael Gates as Amici Curiae on behalf of Plaintiff and Appellant.

Lynberg & Watkins, Norman J. Watkins, S. Frank Harrell, Shannon L. Gustafson and Pancy Lin for Defendants and Respondents.

Jennifer B. Henning for California State Association of Counties and League of California Cities as Amici Curiae on behalf of Defendants and Respondents.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Christopher J. Keane
548 Market Street, Suite 23851
San Francisco, CA  94104
(415) 398-2777

Norman J. Watkins
1100 Town & Country Road, Suite 1450
Orange, CA  92868
(714) 937-1010